MARK P. GIMBEL
(*pro hac vice*; NY Registration No. 2998102)
C. WILLIAM PHILLIPS
(*pro hac vice* pending: NY Registration No. 1885573)
DAVID A. KRONIG
(*pro hac vice*; NY Registration No. 5302054)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
Fax: (646) 441-9161

MARK Y. CHEN (Bar No. 310450)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067
Tel: (424) 332-4800
Fax: (424) 332-4749
mychen@cov.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IN RE ILLUMINA, INC.
SECURITIES LITIGATION

Master File No. 3:16-CV-03044-L-MDD

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

Date and Time:  Stipulated Alternate Briefing Schedule (*see* ECF Doc. 26)

Courtroom:  5B

Hon. M. James Lorenz

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND AND ALLEGATIONS ................................................................... 2

I.     The Illumina Parties ................................................................................. 2

II.    Illumina's Business and Products ........................................................... 3

III.   Illumina's Third Quarter 2016 Earnings ............................................. 5

IV.    The Challenged Statements ..................................................................... 6

       A.    Second Quarter 2016 Earnings Guidance ..................................... 6

       B.    Sarbanes-Oxley Certifications ....................................................... 9

ARGUMENT ........................................................................................................... 10

I.     PLAINTIFFS' CLAIMS BASED ON ILLUMINA'S EARNINGS
       GUIDANCE ARE BARRED BY THE PSLRA'S SAFE HARBOR. ......... 12

       A.    The Challenged Statements Are All Forward-Looking in
             Nature. ......................................................................................... 12

       B.    The Defendants' Forward-Looking Statements Are Not
             Actionable Because They Were Identified as Such and
             Accompanied by Cautionary Language. ....................................... 13

       C.    Even if the Forward-Looking Statements Were Insufficiently
             Identified or Unaccompanied By Cautionary Language, the
             Safe Harbor Would Apply. ........................................................... 16

II.    The Sarbanes-Oxley Certifications are Not Actionable. ..................... 19

       A.    The Complaint Fails to Adequately Plead the Falsity of Any
             Sarbanes-Oxley Certification. ...................................................... 19

       B.    The Complaint Fails to Adequately Plead Scienter With Respect
             to Any Sarbanes-Oxley Certification. .......................................... 22

III.   Plaintiffs' Section 20(a) Claim Should Be Dismissed. ....................... 25

CONCLUSION ........................................................................................................ 25

i

# TABLE OF AUTHORITIES

**Cases**

*In re Adobe Sys., Inc. Sec. Litig.*,
787 F. Supp. 912 (N.D. Cal. 1992)………………………………………….....................23

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ........................................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................10

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009)......................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................10

*Bodri v. GoPro, Inc.*,
__F. Supp. 3d __, 2017 WL 1732022  (N.D. Cal. May 1, 2017).......................................17

*In re Braskem S.A. Sec. Litig.*,
No. 15-cv-5132, 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017).........................................22

*In re CIT Grp., Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004)........................................................................24

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................23

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ....................................................................16

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ................................................10, 11, 12, 13, 15, 16

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)..................................................................................................11

*Gammel v. Hewlett-Packard Co.*,
905 F. Supp. 2d 1052 (C.D. Cal. 2012) .....................................................................14

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ................................................................................23

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ......................................................................22

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ................................................................................22

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994), *superseded by statute on other grounds as stated in*
    *SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011) ....................................................23

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ...............................................................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ..........................................................................................10

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ...............................................................................23

*In re Leapfrog*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ............................................................17, 18

*In re Leapfrog Enterp. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ..............................................................17

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ..................................................................21

*No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
    320 F.3d 920, 945 (9th Cir. 2003)…………………………………………………...25

*In re Petco Animal Supplies, Inc. Sec. Litig.*,
    No. 05-CV-0823, 2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) .........................12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..........................................................10, 11, 12, 13, 15

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ...............................................................................24

*In re Quality Sys., Inc. Sec. Litig.*,
    60 F. Supp. 3d 1095 (C.D. Cal. 2014) ................................................................16

*Rok v. Indentiv*,
    No. 15-cv-5775, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017)...........................19, 24

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
    2007 WL 760535 (N.D. Cal. 2007) ....................................................................19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..............................................................16

iii

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ........................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................11, 22

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ........................................................................18

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .....................................................................11

*Wade v. Wellpoint, Inc.*,
    740 F. Supp. 2d 994 (S.D. Ind. 2010) .........................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..........................................................22, 24, 25

**Statutes**

15 U.S.C. § 78u–4(b)(2) ........................................................................................2

15 U.S.C. § 78u–5(i)(1)(A).............................................................................1, 12

15 U.S.C. § 78u–5(i)(1)(D).................................................................................12

15 U.S.C. § 78u–5(c)(1)(A)(i) ............................................................................13

15 U.S.C. § 78u–5(c)(1)(B) ...........................................................................16, 19

15 U.S.C. § 78u-4(b)(1)........................................................................................11

15 U.S.C. § 78u-4(b)(2)(A)...................................................................................11

15 U.S.C. §§ 78u-5(c)(1)(A)(i), 78u-5(c)(1)(B)(i) & (ii)(II) .............................12

15 U.S.C. § 78u-5(e) ..............................................................................................3

**Other Authorities**

Fed. R. Evid. 407 ...................................................................................................24

Fed. R. Civ. Pro. 9(b)......................................................................................11, 22

Fed. R. Civ. Pro. 12(b)(6) .....................................................................................10

*In Re Mgmt.'s Report on Internal Control over Fin. Reporting & Certification of
Disclosure in Exch. Act Periodic Reports*, Release No. 8238 (June 5, 2003), 2003 WL
21294970, at 13......................................................................................................21

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PRELIMINARY STATEMENT

Defendant Illumina, Inc. ("Illumina" or the "Company") is a pioneer in the field of genetic sequencing, genotyping, and gene expression equipment. Its breakthrough products allow researchers, medical practitioners and others to analyze genetic material at vastly greater speeds and lower costs than ever before. Because it operates in a highly specialized and rapidly evolving market — one in which demand for its products turns on many variables such as changes in technology, new product introductions, and the availability of government grants and research funding to its customers — future sales trends are difficult to predict. The Company nevertheless provides investors with good faith forecasts of future earnings, while warning that, as with any projections, there are many reasons its guidance might not prove accurate.

This action arises out of a quarter in which Illumina fell short of its earnings guidance. On October 10, 2016, Illumina announced that its 2016 third quarter revenue was approximately $607 million, a 10 percent increase over the third quarter of 2015, but lower than its projection of $625-30 million. Illumina's stock dropped following the announcement, and litigation followed. With the benefit of 20/20 hindsight, Plaintiffs allege that Illumina committed fraud by failing to predict its future earnings accurately. The claim fails because the securities laws do not demand clairvoyance.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") was enacted to curb frivolous securities litigation. One of the principal protections that it offers against abusive claims is a "safe harbor" for forward-looking statements. 15 U.S.C. § 78u–5(c)(1); *id*. § (i)(1)(A). The safe harbor bars any claim for securities fraud that is based — like Plaintiffs' claims here — on forward-looking statements that were identified as such and accompanied by meaningful cautionary language. *Id.* § (c)(1)(A). Indeed, even if a forward-looking statement is not identified as forward-looking or is not accompanied by adequate cautionary language, the safe harbor bars all liability for the statement unless a plaintiff pleads and proves that it was made with "actual knowledge" that it was false. *Id.* § (c)(1)(B). These two prongs of the "safe harbor" were enacted for the explicit purpose

of barring claims of fraud-by-hindsight, and they defeat Plaintiffs' claims here.  All of Illumina's earnings projections were identified as forward-looking and accompanied by meaningful cautionary language, bringing them squarely within the safe harbor.  Even if they had not been, liability would be barred because Plaintiffs' Complaint fails to plead any facts demonstrating that any Defendant had "actual knowledge" that the projections would prove inaccurate.

Perhaps because the safe harbor is such a clear bar to liability, Plaintiffs lard their Complaint with another theory — the allegation that Sarbanes-Oxley certifications signed by Illumina executives during the putative class period were fraudulent, because they purportedly failed to disclose that Illumina's processes for forecasting sales and revenue allegedly were materially flawed.  The claim fails because Plaintiffs do not identify any internal control deficiency, or any inaccuracy in Illumina's financial statements, that rendered the Sarbanes-Oxley certifications false or misleading.  Moreover, even if Plaintiffs could identify such a deficiency, the Complaint utterly fails to plead that any of the Defendants acted with scienter, an essential element of any securities fraud claim under Section 10(b).  The PSLRA requires that Plaintiffs plead "with particularity" facts giving rise to a "strong inference" that the defendant acted with the required state of mind.  15 U.S.C. § 78u–4(b)(2).  As explained in detail below, Plaintiffs' vague and conclusory allegations of scienter fall far short of the mark.

## BACKGROUND AND ALLEGATIONS

### I.    The Illumina Parties

Illumina is a pioneering biotechnology company that creates and manufactures genetic sequencing, genotyping, and gene expression equipment.  *See* Amended Complaint ¶¶ 19-22, ECF No. 28 (hereinafter "Compl."); *see also generally* Ex. 1, Illumina, Inc. Annual Report on Form 10-K for year ending Jan. 3, 2016 ("Illumina 2015 10-K"), at 7-

8.[1]  Illumina's technological innovations allow research scientists, medical practitioners, and other professionals in a diverse range of fields to study genetic material at greater speeds and dramatically lower costs than was possible in the past.  *See id.*

Individual Defendants Francis A. deSouza and Marc A. Stapley (the "Individual Defendants") are Illumina executives.  Mr. deSouza joined Illumina as its President in 2013 and was elevated to Chief Executive Officer in 2016.  Mr. Stapley joined Illumina in 2012 and is currently the Executive Vice President and Chief Administrative Officer, having previously served as the Company's Chief Financial Officer.

## II.    Illumina's Business and Products

Genetic sequencing, at its most basic level, is the process of determining the order of nucleotide bases within a DNA sample.  *See* Compl. ¶ 20; Ex. 1, Illumina 2015 10-K at 5.  Illumina develops and manufactures a variety of integrated systems, consumables, and analysis tools that are designed to accelerate and simplify genetic analysis.  *See* Compl. ¶¶ 20-21; *see also* Ex. 1, Illumina 2015 10-K, at 5.  Its customers include genomic research centers, academic institutions, government laboratories, and hospitals, as well as companies in a broad range of fields from pharmaceuticals to biotechnology and consumer genomics.  *See* Compl. ¶ 19; *see also* Ex. 1, Illumina 2015 10-K, at 4.

Illumina manufactures a variety of genetic sequencing instruments that are designed for different applications in different settings.  The HiSeq system is a powerful, production-scale, high-throughput sequencing system.  *See* Compl. ¶¶ 20, 60.  In January 2014, Illumina introduced the HighSeq X and NextSeq systems.  Compl. ¶ 59.  Like the HiSeq,

---

[1]     Exhibits cited herein are attached to the Declaration of Mark P. Gimbel in support of Defendants' Motion to Dismiss and consist of public filings that are incorporated in the Complaint by reference or other materials of which the Court may take judicial notice.  *See* 15 U.S.C. § 78u-5(e) ("On any motion to dismiss based upon [the safe harbor for forward-looking statements], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1061-62 (C.D. Cal. 2012) (court may take judicial notice of SEC filings).

the HiSeq X is also a production-scale, high-throughput system. *Id.* However, it offers distinct cost advantages for sequencing whole genomes. *See* Compl. ¶¶ 59-60. NextSeq is a desktop model, well-suited for smaller research laboratories, that performs a variety of sequencing functions at substantially lower cost. *See id.* ¶ 22, 59. The Company also manufactures "devices known as arrays," which "provide DNA analysis functions, but on a smaller scale than Illumina's 'sequencing' devices." Compl. ¶ 21.

Although instrument sales are a significant part of its business, Illumina generates most of its revenue from "consumables" (such as reagents, flow cells, and microarrays) that are used with Illumina's instruments. *See generally* Ex. 1, Illumina 2015 10-K, at 7. Consumable revenue has in recent periods represented a large majority of the Company's earnings. *See, e.g.*, Compl. ¶ 34 (reporting that, in the second quarter of 2016, "[c]onsumable revenue represented 63% of total revenue").

Illumina's high throughput genetic sequencing instruments are complex, sophisticated pieces of equipment that sell at high prices per unit. As a result, the sale of a handful of units less than forecast can impact projected revenue substantially. *See* Compl. ¶ 26 (shipment of 19 fewer HiSeq instruments produced $14 million less revenue than anticipated, contributing to overall shortfall of $9 million). Sales and revenue projections are also subject to numerous other uncertainties that Illumina warns investors about in its public filings with the Securities and Exchange Commission ("SEC"). These include "risks relating to product transitions," such as the "inability to accurately forecast demand" with respect to both new and pre-existing products; the "timing of introduction of new products or services relative to competing products and services"; the "availability, quality, and price" of Illumina products "relative to competing products and services"; "the research and development budgets and government funding" of Illumina customers; the difficulty of predicting the "timing and magnitude of sales" of products and services; and the fact that "revenue generation" is "normally not linear," but concentrated heavily in "the final weeks of [a] quarter." Ex. 1, Illumina 2015 Form 10-K, at 11-22.

In addition to disclosing these risks in its public filings, the Company provides relevant perspective in earnings conference calls. In May of 2016, for example, the Company conducted a conference call to discuss its first quarter earnings, and commented on the impact of new product introductions on earnings estimates, noting that HiSeq sales for the quarter were less than projected for various reasons, including "customers opting to purchase NextSeq's" instead. *See* Compl. ¶ 26; Ex. 2, Q1 2016 Illumina Inc. Edited Earnings Call Transcript (May 3, 2016) (hereinafter "May 3, 2016 Earnings Call Transcript"), at 3.

## III. Illumina's Third Quarter 2016 Earnings

On October 10, 2016, Illumina issued a press release announcing estimated 2016 third quarter revenue of approximately $607 million — an amount that was a 10 percent increase over the third quarter of 2015, but lower than the Company's projected earnings of $625-30 million. *See* Compl. ¶ 52. During an investor teleconference that same day, Mr. deSouza explained that "[t]he primary driver of this miss was high throughput instrument sales . . . . HiSeq 2500 and 4000 orders . . . were lower than expected, and we closed one less HiSeq X system deal than anticipated." *Id.* ¶ 53.

On November 1, 2016, Illumina hosted an investor call to provide additional perspective on its third quarter revenues. On the call, Mr. deSouza confirmed that some of the shortfall resulted from "legacy HiSeq customers favoring the HiSeq X and NextSeq platforms." Ex. 3, Q3 2016 Illumina Inc. Edited Earnings Call Transcript, at 3 (Nov. 1, 2016) (hereinafter, "November 1, 2016 Earnings Call Transcript"); *see also* Compl. ¶ 59. He also discussed other factors that influenced the earnings miss, including delays in projected shipments of HiSeq X instruments due to "customer-specific situations" and changes in government funding practices. Ex. 3, November 1, 2016 Earnings Call Transcript, at 3 (noting that approximately 35 HiSeq X instruments that were previously forecast to ship in the second half of 2016 had now "moved out of the second half"). In order to better account for such trends, the Company announced that it would institute a

new forecasting project to achieve better "visibility and predictability of the pipeline," to "improv[e] the market insights that we have," and to connect those insights "to the forecasted pipeline." Compl. ¶ 60.

Following the Company's third quarter earnings announcement on October 10, 2016, the price of Illumina's common stock dropped, falling from $184.85 per share on October 10, 2016 to $138.99 on October 11 and $136.18 on October 12. *Id.* ¶ 54. The stock has since recovered, hitting a post-class period high of $188.85 on May 4, 2017.[2] Despite the strong performance of Illumina shares, Plaintiffs in this action seek to recover purported damages for the brief stock drop that occurred following the Company's third quarter 2016 earnings miss.

## IV.    The Challenged Statements

Plaintiffs allege that Illumina made several false or misleading statements in the months prior to the October 10, 2016 announcement that it would not meet its third quarter 2016 earnings guidance.  These fall into two categories: (A) sales and revenue projections for the third quarter of 2016 and related statements, and (B) Sarbanes-Oxley certifications signed by the Individual Defendants attesting to the accuracy of the Company's internal controls over financial reporting.

### A.    *Second Quarter 2016 Earnings Guidance*

On July 26, 2016, Illumina issued financial outlook and guidance for the third quarter of 2016.  *See* Compl. ¶ 31; *see also* Ex. 4, Press Release, Illumina Reports Financial Results for Second Quarter of Fiscal Year 2016 (July 26, 2016) (hereinafter, "July 26, 2106 Earnings Release"), at 2.  The Company projected that third quarter revenue would grow by twelve percent, to $625 to $630 million.  *See* Compl. ¶ 31; *see also* Ex. 4, July 26, 2016 Earnings Release, at 2.

---

[2]     *See* Wall Street Journal, Illumina Inc., *available at* http://quotes.wsj.com/ILMN (last visited July 31, 2017).

During an investor call later that day, Mr. deSouza explained that the forecast was based in part on the expectation that sales of HiSeq X instruments would remain robust and that sales of HiSeq instruments would increase during the latter part of the year:

> Going forward, our HiSeq X outlook remains robust at 20 or 30 instrument orders per quarter, and we expect to see an increase in HiSeq placements in the Americas during the latter part of this year, which is supported by a solid pipeline.

Compl. ¶ 33; *see also* Ex. 5, Q2 2016 Illumina Inc. Edited Earnings Call, July 26, 2016 (hereinafter, "July 26, 2016 Earnings Call Transcript"), at 4.  In the ensuing question and answer session with analysts, Mr. deSouza and Mr. Flatley made various other statements reiterating the revenue guidance and the assumptions behind it, including the Company's projection that there "would be further strength, especially in the HiSeq line, as we get towards the end of the year."  Compl. ¶ 36; *see also id.* ¶ 34 ("[W]e continue to expect to see an uptick in the second half, primarily Q4 in the Americas," in HiSeq sales); *id.* ¶ 40 ("We understand their business, and the demands on their business, and that's what allows us to  project when we think they'll be needing [HiSeq] instruments . . . .").

Plaintiffs allege that the guidance and related statements misleadingly "provided investors with the impression that [Defendants] possessed the capability to accurately forecast sales and revenue." *Id.* ¶ 35.  However, the Company warned, both in its written earnings guidance, and at the outset of the earnings call, that all of its "[f]orward-looking statements are subject to risks and uncertainties" that might cause "[a]ctual events or results" to "differ materially from those projected or discussed."  Ex. 5, July 26, 2016 Earnings Call Transcript, at 2-3; Ex. 4, July 26, 2016 Earnings Release, at 3.  "To better understand the risks and uncertainties that could cause actual results to differ," the Company referred investors to "the documents that Illumina files with the Securities and Exchange Commission, including Illumina's most recent Forms 10-Q and 10-K."  Ex. 5, July 26, 2016 Earnings Call Transcript, at 3.

These filings, in turn, include very detailed disclosure of a variety of risks bearing on earnings projections.  Illumina's Form 10-K, for example, contains eleven pages of

7

discussion of the risk factors that could adversely affect Illumina's financial performance. *See* Ex. 1, 2015 Form 10-K, at 11-22.  Among these is an explicit warning that Illumina faces various difficulties in forecasting customer demand, including difficulties arising from product transitions:  "When we introduce or announce new or enhanced products, we face numerous risks relating to product transitions, including the inability to accurately forecast demand (including with respect to our existing products)." *Id.* at 11.

Plaintiffs further allege that Illumina's earnings guidance was false or misleading because "[c]ustomer preferences for newer HiSeq models had already begun to negatively impact the company's sales and revenue," and "Defendants internal controls and forecasting processes either failed to account for the trend or, alternatively, Defendants deliberately ignored it."  Compl. ¶ 35.  The Complaint, however, does not plead facts showing that any Defendant knew, as of the date of the earnings guidance, that customer preferences for "newer HiSeq" models would impact earnings in an amount sufficient to make Illumina's earnings guidance unattainable.   Nor does the Complaint plead facts showing that such a trend was "deliberately ignored."  To the contrary, the earnings call Plaintiffs quote in the Complaint shows that the Company was taking into account product transitions in its forecasting, noting that "we removed approximately 45 HiSeqs from our installed base in the second quarter, *reflecting the units taken off-line due to adoption of newer machines*."  Ex. 5, July 26, 2016 Earnings Call Transcript, at 5 (emphasis added).

In addition to challenging the Company's formal earnings guidance, Plaintiffs assert that subsequent statements of Mr. Stapley, on an investor conference call during the Morgan Stanley Global Healthcare Conference on September 13, 2013, misleadingly "reaffirmed Illumina's previously stated projections for the third quarter of fiscal 2016." Compl. ¶ 49.  Specifically, Mr. Stapley stated:

> [W]e've provided guidance on the second quarter earnings call that implied
> a sequential growth in Q3 and a sequential growth from that point into Q4
> and part of that is driven by the backlog of HiSeq X's that we have now
> booked into our order system at this point in time; some of which is driven

by strength in China and we [cited] 30 systems per quarter in Q3 and Q4 of
HiSeq X; that's individual units of X.

*Id.* ¶ 49.

According to the Complaint, these statements "created the false impression that
Illumina possessed the internal controls and insight into the company's sales pipeline to
accurately project revenue." *Id.* ¶ 50.  However, investors were reminded at the outset of
the call about the risks of forward-looking statements.  Ex. 6, Edited Transcript Illumina
Inc. at Morgan Stanley Global Healthcare Conference, at 2 (Sept. 13, 2016) (hereinafter,
"Morgan Stanley Investor Call Transcript") ("Before I get into some opening statements
I'd just like to remind everybody about our Safe Harbor Statement.").   The written
transcript of the call further cautioned that "forward-looking statements are based upon
current expectations and involve risks and uncertainties" and that "[a]ctual results may
differ materially from those stated in any forward-looking statement based on a number of
important factors and risks, which are more specifically identified in the companies' most
recent SEC filings." *Id.* at 11.

## B.    Sarbanes-Oxley Certifications

On August 2, 2016, Illumina filed its quarterly report on Form 10-Q for the second
quarter of 2016.  *See* Compl. ¶ 45.  The report contained Sarbanes-Oxley certifications
signed by Mr. deSouza and Mr. Stapley, providing, *inter alia*, that:

- based on the knowledge of the certifying party, "this [Form 10-Q]
  report does not contain any untrue statement of a material fact or
  omit to state a material fact necessary to make the statements made,
  in light of the circumstances under which such statements were
  made, not misleading with respect to the period covered by this
  report";

- the certifying parties had "designed such internal control over
  financial reporting, or caused such internal control over financial
  reporting to be designed under our supervision, to provide
  reasonable assurance regarding the reliability of financial reporting
  and the preparation of financial statements for external purposes in
  accordance with generally accepted accounting principles"; and

9

- based on their "most recent evaluation of internal control over financial reporting," the certifying parties had disclosed to the Company's auditors and board of directors "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information."

*Id.* (emphasis from Complaint removed and restored to original).

Plaintiffs allege that these statements were materially misleading because they failed to mention "the fact that Defendants' processes relating to forecasting sales and/or revenue were materially flawed." *Id.* ¶ 46. The Complaint does not, however, identify a specific internal control deficiency or explain how, if at all, such a deficiency impacted the Company's sales or revenue forecasts. Nor does it identify any inaccuracy in the quarterly financial report to which the Sarbanes-Oxley certifications were attached, which contained no sales or revenue projections.

## ARGUMENT

To survive a motion to dismiss pursuant to Rule 12(b)(6), a securities fraud complaint must adequately allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)). These elements may not be pleaded in vague or conclusory fashion. Rather, under the Supreme Court's decisions in *Iqbal* and *Twombly*, a complaint "'is properly dismissed if it fails to plead enough facts to state a claim to relief that is plausible on its face.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1107 (9th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This pleading standard is heightened in a securities fraud case because of the demanding pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.  Rule 9(b) requires a plaintiff to plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Under the rule, a plaintiff must specify  "the who, what, when, where, and how" of the fraud and "set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotations omitted).  The heightened pleading requirements of Rule 9(b) are intended to protect defendants from the significant harm to reputation "that comes from being subject to fraud charges." *Id.* at 1104.

The PSLRA goes further, imposing even more "[e]xacting pleading requirements" that were designed as a "check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The statute provides that a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  In addition, the complaint must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  The required state of mind is scienter — "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Police Ret. Sys. of St. Louis*, 759 F.3d at 1061 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976)).

"Forward-looking statements like the earnings projections are further insulated from liability." *Cutera*, 610 F.3d at 1108.  "Earnings projections identified as forward-looking statements and accompanied by meaningful cautionary language fall within the PSLRA safe harbor" and are completely insulated from liability without regard to a defendant's state of mind.  *Id.*  Even forward-looking statements that are not identified as such and are not accompanied by cautionary language are not actionable, "unless they were 'made with

actual knowledge . . . that [they were] false or misleading.'" *Id.* (citing 15 U.S.C. §§ 78u-5(c)(1)(A)(i), 78u-5(c)(1)(B)(i) & (ii)(II)).  "Actual knowledge" is an even higher level of scienter than applies to a typical securities fraud claim.  *See In re Petco Animal Supplies, Inc. Sec. Litig.*, No. 05-CV-0823, 2006 WL 6829623, at *27 (S.D. Cal. Aug. 1, 2006).

As explained in detail below, Plaintiffs' Complaint fails to meet these exacting standards for pleading securities fraud.

## I.  PLAINTIFFS' CLAIMS BASED ON ILLUMINA'S EARNINGS GUIDANCE ARE BARRED BY THE PSLRA'S SAFE HARBOR.

Congress enacted the PSLRA to "eliminate abusive and opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).  The statute accordingly provides a safe harbor for "forward-looking statements" that insulates such statements from liability even when they prove inaccurate in retrospect.  *See* 15 U.S.C. §§ 78u–5(c), (i)(1)(A).  Here, Illumina's third quarter 2016 earnings guidance, and the related statements challenged in the Complaint, all fall squarely within the statutory safe harbor.

### A.   The Challenged Statements Are All Forward-Looking in Nature.

The PSLRA defines a forward-looking statement as, *inter alia*, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items."  15 U.S.C. § 78u–5(i)(1)(A); *see also Cutera*, 610 F.3d at 1111.  The statutory definition also extends to "any statement of the assumptions underlying or relating to any statement" regarding such projections.  15 U.S.C. § 78u–5(i)(1)(D).

Plaintiffs' claims relating to Illumina's earnings guidance are based on statements that all fall comfortably within the definition of forward-looking statements.  Each of the challenged statements relates to Illumina's projected earnings and related assumptions, including the Company's forecast of when customers would place orders for sequencing instruments and which units they would acquire.  *See, e.g.*, Compl. ¶ 31 ("For the third quarter 2016, the Company is *projecting* revenue of $625 million to $630 million.")

12

(emphasis added);  *id.* ¶ 33 ("we *expect to see* an increase in HiSeq placements in the Americas *during the latter part of this year*") (emphasis added); *id.* ¶ 34 ("We are *forecasting Q3 revenue of $625 million to $630 million . . . .*") (emphasis added); *id.* ¶ 36 ("If we look at the back half of the year, we *expect to see* further strength . . . ." (emphasis added);  *id.* ¶ 40 ("that's what *allows us to project* when we think they'll be needing instruments") (emphasis added).  These statements "[are] by definition . . . forward-looking statement[s]."   *Cutera*, 610 F.3d at 1111.   They are "classic growth and revenue projections, which are forward-looking on their face."  *Police Ret. Sys. of St. Louis*, 759 F.3d at 1058.

> **B.**   **The Defendants' Forward-Looking Statements Are Not Actionable Because They Were Identified as Such and Accompanied by Cautionary Language.**

Under the first prong of the safe harbor, a forward-looking statement that is identified as such and accompanied by meaningful cautionary language is completely insulated from liability without regard to the defendants' state of mind.   *See Cutera*, 610 F.3d at 1112 (holding that such statements are not actionable "regardless of the plaintiff's showing of scienter"); 15 U.S.C. § 78u–5(c)(1)(A)(i).  This prong of the safe harbor is fatal to Plaintiffs' claims, because all of the forward-looking statements at issue were identified as forward-looking and accompanied by meaningful cautionary statements.

Illumina's third quarter 2016 earnings guidance, and the other related statements that Plaintiffs challenge in the Complaint, were all prefaced or accompanied by warnings alerting investors to the forward-looking nature of the information provided.  Illumina's written earnings guidance, for example, included a statement that it "contains projections, information about our financial outlook, earnings guidance, and other forward-looking statements that involve risks and uncertainties." Ex. 4, July 26, 2016 Earnings Release, at 3.  The July 26, 2016 investor conference call in which the Company elaborated on this guidance was likewise preceded by a statement informing investors that the discussion would include "forward-looking statements regarding expected financial results. " Ex. 5, July 26, 2016 Earnings Call Transcript, at 2-3.  The other investor conference calls

referenced in the Complaint included similar statements.  *See* Ex. 2, May 3, 2016 Earnings Call Transcript, at 3; Ex. 6, Morgan Stanley Investor Call Transcript, at 2, 11.  These statements were sufficient to identify all of the statements at issue as forward-looking in nature.  *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1066 (C.D. Cal. 2012) (holding it sufficient that summit and earnings call participants were advised that defendants' "statements might include forward looking information that involved risk, uncertainties and assumptions" and were directed to defendant's "Form 10–Q for a more detailed description of relevant risks" (quotations omitted)).

Each of the challenged statements was also accompanied by meaningful cautionary language.  Illumina's written earnings guidance for the third quarter of 2016 listed numerous factors that might cause actual results to differ from projections, including:

> (i) our ability to further develop and commercialize our instruments and consumables and to deploy new products, services and applications, and expand the markets for our technology platforms; . . . (iv) the future conduct and growth of the business and the markets in which we operate; [and] (v) challenges inherent in developing, manufacturing, and launching new products and services . . . .

Ex. 4, July 26, 2016 Earnings Release, at 3.  It also referred investors to the Company's "most recent filings on Forms 10-K and 10-Q" for additional factors that could "cause actual results to differ materially from those in any forward-looking statements . . . ." *Id.*

The July 26 conference call in which the Company discussed its third quarter 2016 earnings guidance was likewise preceded with an announcement that "[f]orward-looking statements are subject to risks and uncertainties" and that "[a]ctual events or results may differ materially from those projected or discussed."  Ex. 5, July 26, 2016 Earnings Call Transcript, at 2-3.  Investors participating in the earnings call were informed that, "[t]o better understand the risks and uncertainties that could cause actual results to differ," they should consult "the documents that Illumina files with the Securities and Exchange Commission, including Illumina's most recent Forms 10-Q and 10-K." *Id.*  The other

investor calls at issue included substantially similar warnings.  *See* Ex. 2, May 3, 2016 Earnings Call Transcript, at 3; Ex. 6, Morgan Stanley Investor Call Transcript, at 11.

The Company's SEC filings in turn provided an even more extensive discussion of the risks and uncertainties involved in the Company's earnings projections.  Illumina's Form 10-K for calendar year 2015, for example, contains *eleven pages* of discussion of numerous issues that could adversely affect Illumina's financial performance.  *See* Ex. 1, 2015 Form 10-K, at 11-22.  Among these are an explicit warning that Illumina faces particular difficulties in forecasting customer demand when new products such as the NextSeq and HiSeq X are introduced:

> When we introduce or announce new or enhanced products, we face numerous risks relating to product transitions, including the inability to accurately forecast demand (including with respect to our existing products).

*Id*. at 11.  The Company thus not only provided meaningful cautionary language warning investors about the risks of forward-looking statements, but disclosed the very risk that Plaintiffs claim was concealed — that Illumina might be unable to accurately predict the impact of new product introductions on sales of existing products.

These statements clearly were sufficient to warn investors of the uncertainties and risks inherent in Illumina's revenue projections.  The Ninth Circuit repeatedly has found similar language sufficient to trigger the safe harbor.  *See, e.g.*, *Police Retirement System*, 759 F.3d at 1059 (upholding adequacy of cautionary language providing that "[a]ctual results may differ materially from those expressed or implied," as a result of "risks and uncertainties [that] are described in detail in the company's [SEC] filings"); *see also Cutera*, 610 F.3d at 1112 (approving cautionary language that "began with a notice that 'these prepared remarks contain forward-looking statements concerning future financial performance and guidance,' that 'management may make additional forward-looking statements in response to[ ] questions,' and that factors like Cutera's 'ability to continue increasing sales performance worldwide' could cause variance in the results").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

16-CV-3044-L-MDD

In short, the Defendants' statements concerning projected third quarter 2016 earnings and related matters were all identified as forward-looking and accompanied by meaningful cautionary language.  As a result, they are completely insulated from liability under the safe harbor.  *See Cutera*, 610 F. 3d at 1111.

> C.   *Even if the Forward-Looking Statements Were Insufficiently Identified or Unaccompanied By Cautionary Language, the Safe Harbor Would Apply.*

Even if the Court were to find that any of the forward-looking statements at issue were inadequately identified, or unaccompanied by sufficient cautionary language, it would make no difference.  Under the second prong of the safe harbor, even an unidentified forward-looking statement — or one unaccompanied by cautionary language — is protected unless "made with *actual knowledge* . . . that the statement was false or misleading. 15 U.S.C. § 78u–5(c)(1)(B) (emphasis added); *see also City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062–63 (N.D. Cal. 2012).

A plaintiff who alleges that a forward-looking statement was made with actual knowledge of falsity "must plead, in great detail, all the facts forming the basis for their belief that defendants made the forward-looking statements with actual knowledge that they were false." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1069 (N.D. Cal. 2001) (quotations omitted); *see also In re Quality Sys., Inc. Sec. Litig.*, 60 F. Supp. 3d 1095, 1097, 1103 (C.D. Cal. 2014) (allegations that defendants "had access to real-time data on QSI's revenues and earnings and thus knew that QSI's sales and sales prospects were declining" were conclusory and insufficient to demonstrate actual knowledge).  Here, the Complaint is bereft of factual allegations establishing that any of the Defendants knew that any forward-looking statement was false when made.

Plaintiffs allege that the Defendants knew or should have known that HiSeq instrument sales were declining at the time they released Illumina's earnings guidance, Compl. ¶ 3, but this allegation does not establish that the Defendants knew the Company's *overall earnings guidance* — which encompassed many products and services — was false.  Even assuming that the Defendants were aware of a decline in HiSeq sales, it would

not necessarily follow that Illumina could not meet its earnings guidance in light of other sources of revenue.  In *In re Leapfrog Enterp. Sec. Litig.*, for example, the plaintiffs argued that the defendants had actual knowledge that the company's earnings guidance was false because they were aware that the introduction of a competing product was "severely impacting . . . sales growth."  527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (alteration in original).  The Court rejected the argument, because the mere fact that the defendants were aware of this negative trend did not necessarily "render any of the specific predictive statements false when made."  *Id.*

The same is true here.  Even assuming that the Defendants were aware of declining HiSeq sales, it would not necessarily have led them to conclude that the Company's earnings guidance was inaccurate.  The Defendants could instead have concluded that the earnings projections were attainable either because they did not believe the decline in HiSeq sales would continue or because other positive trends — such as projected increases in sales of other instruments or of the consumables that constitute a majority of the Company's business — would allow the Company to meet its earnings forecasts.  *See In re Leapfrog*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016) (allegations insufficient to establish knowledge that inventory projections were false where complaint failed to negate alternative explanation that "Defendants may well have been anticipating that the inventory was going to move more quickly over the next two or three months").

*Bodri v. GoPro, Inc.*, __ F. Supp. 3d ___, 2017 WL 1732022 (C.D. Cal. May 1, 2017) provides a useful example.  There, the plaintiff alleged that GoPro's overall quarterly earnings guidance was false, because it knew at the time of the earnings projections that sales of a new product — the GoPro "Sessions" — were "lagging."  *Id.* at *2, 11.  The Court rejected the argument and dismissed the claim, holding that Plaintiffs had failed to allege facts establishing that the Defendants "had actual knowledge that GoPro's guidance was false or could not be met when issued."  *Id.* at 11.  In particular, the complaint failed to allege any facts showing that "[s]trong Session sales were instrumental to the guidance, and were being knowingly overstated, or that Defendants were in possession of sales

17

forecasts that would render their guidance misleading or false." *Id.* (quotations omitted). Here, as in *GoPro*, the Complaint fails to allege facts showing that the Illumina's forecasts of HiSeq sales were both instrumental to its earnings guidance, which encompassed many other products, and knowingly overstated.[3]   The Complaint thus fails to allege actual knowledge that the guidance was false.

Indeed, Plaintiffs themselves tacitly admit that the Defendants lacked *actual knowledge* that the purported HiSeq sales trend would prevent the Company from attaining its projected results.  Instead of pleadings facts demonstrating that the Defendants knew that this purported trend would render it impossible for the Company to meet its earnings guidance, the Complaint pleads that the trend went "*unnoticed* during the forecasting process." *Id.* ¶ 3 (emphasis added); *see also id.* ¶ 35 (alleging that forecasting processes may have "failed to account for the trend").  If, as Plaintiffs allege, the Defendants *failed to notice* this sales trend, or *failed to account for it* in their forecasts, then they plainly did not have *actual knowledge* that the trend would render the Company's earnings guidance unattainable.

At bottom, Plaintiffs have alleged *no* facts to support their bald assertion that the Defendants had actual knowledge that Illumina would miss its earnings guidance. "Plaintiffs' theory is basically an assertion of fraud by hindsight — judging the statements on how things actually turned out subsequently." *In re Leapfrog*, 200 F. Supp. 3d at 1005. The Complaint thus fails to demonstrate that any defendant had actual knowledge that the earnings guidance was inaccurate when issued.  *See generally In re VeriFone Sec. Litig.*,

---

[3]      *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996) provides another useful example.  In *Syntex*, plaintiffs alleged that predictions regarding FDA approval of a new product were misleading because of known deficiencies in the company's testing procedures.  The court rejected the argument, reasoning that the "company could have known of problems in the testing procedures, planned to remedy those deficiencies, and still thought it would achieve FDA approval by the estimated date." *Id.* at 930.  Similarly, here, even if Defendants were aware of declining HiSeq sales at the time of the earnings guidance, they could have concluded that sales would recover in the latter part of the year or that sales of other products and services sufficed to support the guidance.

18

11 F.3d 865, 871 (9th Cir. 1993) ("The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made."). Plaintiffs' claims are thus barred by the safe harbor. *See* 15 U.S.C. § 78u–5(c)(1)(B).

## II.   The Sarbanes-Oxley Certifications Are Not Actionable.

Plaintiffs' Complaint is no more viable to the extent that it rests on the Sarbanes-Oxley certifications appended to Illumina's Form 10-Q for the second quarter of 2016. As a threshold matter, it is far from clear that a Sarbanes-Oxley certification is actionable under Section 10(b). Although the caselaw on the question is mixed, at least one district court in this Circuit has held that there is "nothing in either the 1934 Securities Exchange Act or the Sarbanes-Oxley Act and implementing regulations that authorized plaintiffs to base a claim for securities fraud on an alleged misstatement in a Sarbanes-Oxley certification." *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at *17 (N.D. Cal. 2007); *see also Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1182 (S.D. Cal. 2009) (observing that "Plaintiff does not cite, nor has the Court located, any case holding that a statement in a SOX certification that financial statements comply with GAAP is independently actionable under § 10(b) or Rule 10b–5"). Moreover, even assuming it is theoretically possible to bring such a claim, the Complaint here fails to do so because the factual allegations of the pleading fail to establish the essential elements of falsity and scienter with respect to any Sarbanes-Oxley certification.

### A.   The Complaint Fails to Adequately Plead the Falsity of Any Sarbanes-Oxley Certification.

In *Rok v. Indentiv*, after assuming (without deciding) that a Sarbanes-Oxley certification can give rise to liability under Section 10(b), the court held that a plaintiff proceeding on such a theory must plead falsity with particularity by identifying the specific statements in the certification that are alleged to be false or misleading and providing "specific facts or reasons to show how each statement was false or misleading." 2017 WL 35496, at *9 (N.D. Cal. 2017) (quotations omitted). Here, while the Complaint identifies three statements in the Sarbanes-Oxley certifications that Plaintiffs claim were false or

19

misleading, it is devoid of any factual allegations demonstrating "how each statement was false or misleading." *Id.*

First, Plaintiffs allege that it was misleading for the Individual Defendants to certify that the Company's Form 10-Q "report [for the second quarter of 2016] does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." Compl. ¶ 45.  The allegation fails because it is entirely conclusory.  The Complaint does not identify any "untrue statement of material fact" or material omission in the Form 10-Q that would render this certification false.  Indeed, the only alleged omission — that "Defendants' processes relating to forecasting sales and/or revenue were materially flawed," *id.* ¶ 46 — concerns a subject that is not even addressed in the referenced 10-Q, which reports on *actual* results for the period, not forecasts of future earnings.  *See generally* Ex. 7, Illumina, Inc. Quarterly Report on Form 10-Q for Quarterly Period ending July 3, 2016 ("Illumina 2Q16 10-Q").

Second, Plaintiffs contend that it was misleading for the Individual Defendants to certify that they had "designed such controls over financial reporting, or caused such internal control over financial reporting to be designed" to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" — i.e., "GAAP." Compl. ¶ 45.  Again, the allegation is entirely conclusory.  The Complaint fails to plead any facts showing that the Individual Defendants failed to design (or cause the design of) internal controls that provided reasonable assurance as to the reliability of Illumina's financial reporting or its compliance with GAAP.  Nowhere in the Complaint do Plaintiffs identify a specific internal control that the Defendants failed to implement; an internal control that was weak or deficient in some particular respect; or any resulting GAAP violation or other error in Illumina's reported financial results.

Third, Plaintiffs assert that it was misleading to certify that "all significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to affect" the Company's "ability to record, process, summarize and report financial information" had been disclosed to Illumina's auditors and the audit committee of its Board. Compl. ¶ 45. Again, however, the allegation is conclusory. Plaintiffs fail to identify any internal control deficiency that the certifying party failed to report to Illumina's audit committee or outside auditors.

Plaintiffs' theory appears to be that, because Illumina missed its earnings guidance, it must have had inadequate internal controls. But this is just a claim of fraud by hindsight that is unsupported by factual allegations, logic, or common sense. Nobody can predict the future with certainty, and the mere fact that a defendant's earnings projection for a given period proves inaccurate in hindsight does not mean that its internal controls over financial reporting were flawed. *Cf. Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D. Cal. 2015) ("Today, with the benefit of knowing the details of Miller's misconduct and the failure of Polycom's internal controls to catch that misconduct, it might seem misleading for Polycom to have stated its internal controls were adequate" but the court cannot "simply assume" that "internal controls were inadequate" because fraud occurred; even a "full set of supervisory mechanisms to oversee a company may fail to uncover misconduct or fraud" (internal quotations omitted)).[4]

Pleading falsity with the particularity required by Rule 9(b) and the PSLRA demands more. To demonstrate that a Sarbanes-Oxley certification was false, a plaintiff must plead facts demonstrating falsity, such as a specific internal control deficiency that the defendant

---

[4]     We are unaware of any caselaw supporting Plaintiffs' assumption that a party may be held liable for falsely certifying "internal controls over financial reporting" based on alleged deficiencies in controls over financial *forecasting* — as opposed to controls over the reporting of *actual, historical financial results*. Notably, the SEC release explaining Sarbanes-Oxley certification requirements makes no mention of earnings guidance and focuses on internal controls that relate to reporting of actual results, such as "controls over initiating, recording, processing and reconciling account balances, classes of transactions and disclosure and related assertions included in the financial statements . . . ." *In Re Mgmt.'s Report on Internal Control over Fin. Reporting & Certification of Disclosure in Exch. Act Periodic Reports*, Release No. 8238 (June 5, 2003), 2003 WL 21294970, at *13.

failed to disclose. *See In re Braskem S.A. Sec. Litig.*, No. 15-cv-5132, 2017 WL 1216592, at *16 (S.D.N.Y. Mar. 30, 2017) (dismissing claim based on Sarbanes-Oxley certification where the complaint lacked "any concrete factual allegations that Braskem had deficient internal controls governing its financial reporting"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (dismissing claim based on Sarbanes-Oxley certification were plaintiff "has not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [it] lacked adequate internal controls" (internal quotations omitted)).  The Complaint is utterly lacking in this respect.

> **B.** *The Complaint Fails to Adequately Plead Scienter With Respect to Any Sarbanes-Oxley Certification.*

The Complaint also fails to adequately plead scienter.  The PSLRA requires a plaintiff to allege with particularity facts that raise a "strong inference" a defendant acted with scienter — a "form of intentional or knowing misconduct that rises above "mere recklessness" and represents "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quotations omitted).  To qualify as a "strong inference," the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  A "court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citation omitted).  Here, Plaintiffs' allegations fall far short of the mark.

The Ninth Circuit has held that a Sarbanes–Oxley certification is "only probative of scienter if the person signing the certification was severely reckless" in signing it.  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (quotations omitted).

Other Circuits have elaborated further, holding that there must be facts showing that the officer who signed the certification had reason to know that it was false "due to the presence of glaring accounting irregularities or other red flags." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 545 (5th Cir. 2008) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). Plaintiffs plead no such facts in the Complaint.

The Complaint alleges that Illumina had missed its earnings guidance on three occasions in the past, for a variety of different reasons. *See* Compl. ¶ 64. But the mere fact that a company missed earnings forecasts on prior occasions is hardly a "glaring . . . irregularity" or "red flag" that would make it "severely reckless" for a defendant to certify the adequacy of its internal controls. Financial projections are inherently uncertain. *See In re Adobe Sys., Inc. Sec. Litig.*, 787 F. Supp. 912, 919 (N.D. Cal. 1992) ("forward-looking statements — and earnings projections in particular — are uncertain by their very nature"). As a result, a company may have perfectly robust internal controls and forecasting processes yet still miss its earnings guidance.

Similarly, there is no merit to Plaintiffs' effort to manufacture an inference of scienter from the fact that Illumina took *subsequent* "remedial measures" to improve its financial forecasting following its third quarter 2016 earnings shortfall. Compl. ¶¶ 76-77. A plaintiff must plead facts demonstrating that a defendant acted with scienter *at the time of a challenged statement or omission. See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994), *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011) (a plaintiff must set forth "an explanation as to why the disputed statement was untrue or misleading *when made*"); *see also City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013) ("The fact that a statement is *later* discovered to be untrue does not mean that, by default, the statement was untrue at the time it was made."). Allegations that Illumina *subsequently* took steps to improve the accuracy of its forecasting say nothing about the Individual Defendants' state of mind when they signed Sarbanes-Oxley certifications in August of

23

2016.  *See Wade v. Wellpoint, Inc.*, 740 F. Supp. 2d 994, 1005 (S.D. Ind. 2010) ("Braly's attempt to improve the accuracy of WellPoint's medical claims forecasting certainly does not create a 'strong inference' that she recklessly disregarded the falsity of her statements on January 23.").  Drawing an inference of scienter from Illumina's efforts to improve its forecasting is not only illogical, but inconsistent with basic rules of evidence governing the admissibility of subsequent remedial measures and the public policy embodied in such rules.  *See* Fed. R. Evid. 407 (subsequent remedial measures not admissible as proof of culpable conduct); *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (citing Fed. R. Evid. 407 and holding that "adding a certification requirement does not show that Tribune's existing controls were insufficient"); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 n.6 (S.D.N.Y. 2004) (citing Fed. R. Evid. 407 and holding that drawing inferences of scienter based on "subsequent remedial measures would do nothing but dissuade restatements and corrections of financial data").

Finally, in determining whether scienter has been adequately pleaded, a court must consider not only the "malicious . . . inferences" urged by the plaintiff but any opposing "innocent inference" that is cognizable from the "facts pled in the complaint" and materials which the court may examine in ruling on a motion to dismiss.  *Zucco*, 552 F.3d at 981.  Here, the record is utterly inconsistent with the theory that any of the Defendants acted intentionally or with "deliberate recklessness" (the minimum level of intent necessary to demonstrate scienter, *see id.* at 991) in an effort to mislead investors as to the accuracy of Illumina's earnings guidance.  Far from misleading investors as to the reliability of earnings projections, the Defendants repeatedly warned that projections were forward-looking statements that might differ materially from actual results for many reasons.  Given these warnings, it is simply not plausible to conclude that the Defendants intended to mislead investors as to the reliability of any financial forecast.  *See Identiv*, 2017 WL 35496, at *12 (defendant's disclosures weighed against inference of scienter).

**III.    Plaintiffs' Section 20(a) Claim Should Be Dismissed.**

To establish "controlling person" liability under Section 20(a), a plaintiff must demonstrate a primary violation of the securities laws and that "'the defendant exercised actual power or control over the primary violator.'"  *Zucco*, 552 F.3d at 990 (quoting *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)).  Here, because Plaintiffs have failed to plead a primary violation of Section 10(b), their Section 20(a) claims necessarily fail.  *See id.* ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

**CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed.

Respectfully submitted,

Dated: July 31, 2017                     COVINGTON & BURLING LLP

By:    */s/Mark P. Gimbel*
                                                     Mark P. Gimbel

Mark P. Gimbel (admitted pro hac vice)
C. William Phillips (pro hac vice pending)
David A. Kronig (admitted pro hac vice)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000

Mark Y. Chen (Bar No. 310450)
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067
Tel: (424) 332-4800

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the following document has been served on July 31, 2017 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4:

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Any other counsel of record will be served by electronic mail, facsimile, and/or overnight delivery.

I declare under penalty of perjury under the laws of United States that the foregoing is true and correct and that this certificate of service was executed on July 31, 2017 at Los Angeles, California.

*/s/Mark Y. Chen*
Mark Y. Chen